**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4546-12T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KEEVIN DAVID, a/k/a KEEVIN
EDWARD DAVID, KEVIN DAVID,
DAVID KEEVIN,

    Defendant-Appellant.

_____

Telephonically argued January 11, 2017 —
Decided August 22, 2017

Before Judges Nugent and Haas.

On appeal from Superior Court of New Jersey,
Law Division, Essex County, Indictment No. 11-
12-2138.

Kelly Anderson Smith argued the cause for
appellant.

Lucille M. Rosano, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued
the cause for respondent (Carolyn A. Murray,
Acting Essex County Prosecutor, attorney;
Andrew R. Burroughs, Special Deputy Attorney
General/Acting Assistant Prosecutor, of
counsel and on the brief).

PER CURIAM

Defendant Keevin David appeals from a judgment of conviction for murder and two weapons offenses.  He argues:

POINT I

 THE JURY CHARGE REGARDING ACCOMPLICE LIABILITY WAS IMPROPER, THUS DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

 A. The Jury Charge Regarding Accomplice Liability Was Given In Error As Defendant Was Denied Due Process And A Fair Trial.

 B. The Court To Properly Include State's Material Witness Gregory Lieberman In Connection To The Inconsistent Statement Charge.

 C. The State Improperly Instructed The Jury As To The Flight Charge In Connection To The Defendant.

 D. The Prosecutor Intentionally Misstated Critical Facts To The Jury, Thereby Prejudicing The Defendant And Causing Him Irreparable Harm.

POINT II

 DEFENDANT WAS IRREPARABLY PREJUDICED AND DENIED A FAIR TRIAL WHEN HIS MATERIAL WITNESS WAS PERMITTED TO TESTIFY IN JAIL CLOTHING AND HANDCUFFS IN FRONT OF THE JURY.

POINT III

 PROSECUTOR'S COMMENTS CONSTITUTE MISCONDUCT AND PREJUDICED THE DEFENDANT.

We agree with defendant's second point, namely, that he was deprived of a fair trial when a witness crucial to his defense

testified in jail garb and handcuffs.  For that reason, we reverse and remand for a new trial.

An Essex County grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree unlawful possession of a weapon, a handgun, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).  In October 2012, a jury found defendant guilty on the weapons counts but failed to reach a verdict on the murder count.

In January 2013, at the conclusion of the retrial on the murder count, the jury found defendant guilty.  The judge sentenced defendant on the murder count to a fifty-five-year custodial term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge sentenced defendant to a concurrent ten-year custodial term with five years of parole ineligibility on the unlawful possession of a weapon count and to a concurrent ten-year custodial term on the possession of a weapon for an unlawful purpose count. Defendant appealed.

Following defendant's retention of new counsel, defendant filed a motion to expand the record.  According to defendant, key witnesses testified in jail garb and handcuffs without comment by the trial court.  An appellate panel denied defendant's motion "without prejudice to renewal after defendant makes and the trial

judge decides a motion to settle the record pursuant to R. 2:5-5."  Following two days of hearings in February and March 2015, a judge — not the trial judge — issued an order and opinion settling the record.  The judge concluded:

> 1.    During Mr. David's first trial held from September 20, 2012 through October 1, 2012[,] both witnesses, Azmar Carter and Gregory Lieberman testified in jail garb and wore handcuffs.
>
> 2.    During Mr. David's [s]econd [t]rial held from January 8, 2013 through January 18, 2013[,] witness Azmar Carter testified in jail pants and shoes while wearing a civilian shirt and witness Gregory Lieberman wore a jail uniform; both Carter and Lieberman wore handcuffs.
>
> 3.    The court finds that there is no record of hearings outside of the presence of the jury on the issue of witnesses wearing jail clothing and/or handcuffs during their testimony.
>
> 4.    The court finds that during neither trial was the jury given an instruction on witnesses' testifying in jail garb or prison garb.

Following the hearings, the parties filed their appellate briefs.

The State developed the following proofs at trial.  In January 2011, the homicide victim, Tyrell Coleman, lived with his mother, father, brother, and sister in an apartment located in a four-story, multi-unit building on the corner of Center and Chapman

4

Streets in Orange.  The building's exterior entryway on Center Street consisted of exterior doors that opened into a vestibule or lobby.  The doors were usually unlocked.  On the opposite side of the lobby was a door that opened into the building's interior. This door was locked.

The victim was shot to death in the lobby on January 25, 2011, at approximately 11:30 a.m., after he came home from school. His father, who was home at the time, heard five gunshots.  He looked out the kitchen window and saw three black men scurry away from his building, across the street, and further down Center Street.  A neighbor knocked on the front door of the victim's apartment and told the victim's father his son was downstairs bleeding.  His father went to the lobby where he found his son lying on the floor.

Three or four months later, the victim's father viewed a video of three men entering a cab near a funeral home "right around the corner from South Center Street," approximately one block away, on Henry Street.  He knew they were the same men he had seen scurry away from his building because he recognized the clothing they wore and the way they looked, but he could not identify them because he never saw their faces.

A construction worker on a nearby project heard the gunshots and saw three teenagers run out of the victim's apartment.  One

spoke to a taxicab driver parked on the corner of South Center and Chapman Streets, but they did not enter the cab. After talking briefly with the cab driver, they continued to run toward Main Street. The construction worker could not identify the three teenagers because he did not see their faces.

Crime scene detectives collected six spent shell casings, a copper jacketed ballistic projectile, and a copper jacketed fragment and one lead ballistic fragment. The cause of the victim's death was multiple gunshot wounds: two in the head, two in the chest.

City of Orange Detective Sergeant Michael Tingolie and Essex County Prosecutor's Detective Phillip Gregory were assigned by their respective offices to investigate the homicide. Each went to the scene on the afternoon of the shooting. After interviewing law enforcement personnel and others at the scene, Detective Tingolie canvased the area for surveillance video cameras. He located one at a funeral home on Henry Street. The surveillance video showed three males run up to a green taxi cab parked across the street. The males entered the cab, and moments later the cab drove off. The detective located the cab driver, who drove with the detective to the house where the cab driver took the three men

on the day of the homicide.  The house was the Monroe Street residence of a young man named Nadine Everet.[1]

During the first several months following the homicide, there were two significant developments in the investigation.  The first occurred after police arrested a young man named Gregory Lieberman for attempting to sell a handgun.  Ballistics tests revealed the handgun was the one used to shoot Tyrell Coleman.  The second occurred when a young man named Charles McBee, incarcerated on an unrelated offense, gave a video-recorded statement to police about a statement defendant allegedly made, admitting he shot the victim.

Lieberman testified at defendant's trial.[2]  According to Lieberman, police arrested him on February 8, 2011, when he attempted to sell the gun.  He first saw the gun approximately one and one-half to two weeks earlier, when he drove to a Springfield apartment complex one morning and picked up defendant, Tayshaun Martin, and Nadine Everett.[3]  Although Lieberman was supposed to drive defendant, Martin, and Everett to Everett's house on Monroe Street in Orange, while driving on Jackson Street in Orange, the

---

[1]  The cab driver testified and confirmed the detective's testimony but could not identify the perpetrators.

[2]  Lieberman testified in prison attire and handcuffs.

[3]  Lieberman knew defendant as "Drama," Martin as "Dice," and Everett as "Pop."

A-4546-12T3

passengers saw two people, one walking behind the other. The person in the rear was the victim, Tyrell Coleman. Martin, who was sitting in a rear passenger seat, "pulled out the gun" and "said 'this dude's slippin,' and he racked a bullet in the chamber of the gun." The passengers exited the car at the corner of Jackson and Lincoln streets and told Lieberman to wait, but he did not want to get involved, so he drove away.[4] The passengers walked toward the two people they had seen walking on Jackson Street. Approximately a week later, Lieberman purchased the handgun from Martin, intending to resell it.

McBee testified at trial and recanted his video-recorded statement. The State presented the statement to the jury. According to the statement, McBee was incarcerated when his girlfriend told him during a telephone conversation that the victim had been killed and defendant had killed him. Another inmate, Asmar Carter, who knew defendant, telephoned him in McBee's presence and McBee listened to the conversation. McBee claimed defendant said he, Everett, and Martin were in a car and saw the victim walking home from school. When they first saw him, he was

---

[4] The victim's father testified it would take "about five, ten minutes" to walk from the corner of Jackson and Lincoln to the apartment.

walking past a pharmacy on Central Avenue.[5]  They got out of the car, followed him home, and shot him.  Defendant said he shot the victim; he just ran right up and shot him.  The offense for which McBee was incarcerated was eventually dismissed.

Asmar Carter testified for defendant.[6]  Contrary to McBee's testimony, Carter, age eighteen, testified a corrections officer told him about the victim's death; he had defendant's telephone number memorized, so he did not need to dial it from a piece of paper; and he never discussed the victim's death with defendant.  Carter denied that McBee ever asked him to telephone defendant and also denied ever making a telephone call in McBee's presence.  Carter claimed he only used the telephone in an interview when his social worker, but no one else, was present.

In addition to Carter's testimony, defendant presented the testimony of the victim's friend, who was with the victim shortly before the shooting.  The friend testified they walked from school, side-by-side, on Central Avenue, stopped at a store, and then went

---

[5] The victim's father testified the pharmacy was one-half of a block from his apartment and it would take approximately twenty seconds to a minute to walk from one to the other.

[6] Carter testified in jail pants and shoes but wore a civilian shirt.  He was handcuffed throughout his testimony.

A-4546-12T3

separate ways. The victim's friend said they were never together on Jackson Street.[7]

On appeal, defendant argues in his second point that he was unduly prejudiced when Carter testified in jail garb and handcuffs. We agree.

"The appearance of a defense witness in restraints undermines the credibility of the testimony that witness offers on the defendant's behalf." State v. Artwell, 177 N.J. 526, 536 (2003) (citations omitted). For this reason, and "[b]ecause the appearance of a defense witness in restraints presents a risk of undue prejudice to a defendant, the trial court may subject a witness to physical restraint only when it 'has reason to believe it is necessary to maintain the security of the courtroom.'" Id. at 537 (quoting Harrell v. Israel, 672 F.2d 632, 635 (7th Cir. 1982)).

If the trial court has reason to believe restraining a defendant is necessary to maintain security, then the court "should 'hold a hearing, however informal, and state on the record out of the jury's presence [its] reasons for shackling the [witness], whether they are based on evidence from trial, information obtained

---

[7] Defendant also presented the testimony of a detective who recorded a conversation between Lieberman and Everett about Lieberman returning the gun.

from criminal records, or statements made by law enforcement officers.'" Ibid. (alterations in original) (quoting State v. Damon, 286 N.J. Super. 492, 499 (App. Div. 1996)). The trial "court must 'instruct the jury in the clearest and most emphatic terms that it give such restraint no consideration whatever in assessing the proofs and determining guilt.'" Id. at 538 (quoting State v. Roberts, 86 N.J. Super. 159, 168 (App. Div. 1965)).

Although requiring a witness to testify in restraints may be necessary to maintain security, "requiring a witness to testify in prison clothing 'further[s] no vital State interest[,]" id. at 539 (first alteration in original) (quoting State v. Maisonet, 166 N.J. 9, 17 (2001)), but only serves to "prejudice[] a defendant both in undermining his or her witness's credibility and suggesting a defendant's guilt by association." Ibid. (citing State v. Yates, 381 A.2d 536, 537 (1977)). For these reasons, "a trial court may not require a defendant's witness to appear at trial in prison garb." Ibid. (citations omitted).[8]

In the case before us, the trial court overlooked all of our Supreme Court's pronouncements in Artwell. Nothing in the record

---

[8] In State v. Kuchera, 198 N.J. 482, 486 (2009), the Court exercised its "supervisory powers to require that, as a matter of course and unless otherwise affirmatively permitted by the trial court in the exercise of its discretion, witnesses in criminal cases — both for the prosecution and for the defense — should not testify in prison garb."

suggests that requiring Carter to appear in restraints was necessary to maintain security. The trial court conducted no hearing and provided no reasons for having Carter restrained. Nor did the trial court give the jury any instructions about Carter appearing in prison garb. Because the situation occurred in both trials, defendant's convictions must be reversed and the matter remanded for new trial.

The State points out that defendant did not raise these issues during either trial, so his argument must be reviewed for plain error, that is, whether the alleged error was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971); see also R. 2:10-2. The State also speculates defense counsel could have "effectively waived the matter for possible strategic reasons." The State's arguments are unavailing.

The State has cited no case holding that a trial court's failure to adhere to the Supreme Court's pronouncements in Artwell is irreversible under a plain error analysis. The State's failure to cite such a case is understandable given the Supreme Court's discussion in Artwell, supra, 177 N.J. at 536-37, 539, of the degree to which a defendant is prejudiced when a defense witness is restrained and clothed in prison garb. But even if there are

12                                                    A-4546-12T3

situations in which a defense witness testifying in restraints and prison clothes, and the court failing to conduct a hearing and instruct the jury, do not constitute plain error, this is not one of them.

Here, defendant presented Carter's testimony to refute the statement of a witness who claimed defendant admitted shooting the victim. The statement of the State's witness was a critical piece of evidence. Similarly, Carter's testimony was critical to the defense. We conclude the prejudice occasioned by Carter appearing in restraints and prison garb was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Macon, supra, 57 N.J. at 336. The State's speculation about defense counsel's possible motive for not objecting does not dissuade us.

In view of our reversal of defendant's conviction, we need not address defendant's other arguments. We add only these comments.

The State's evidence supported both the charge on accomplice liability and the charge on flight. The jury could have concluded either that defendant was the shooter, as evidenced by McBee's statement, or that defendant was an accomplice, as implied in Lieberman's testimony and evidenced by parts of McBee's statement. The jury also could have determined from the evidence that

13                                                          A-4546-12T3

defendant was one of the three perpetrators, all of whom scurried from the crime scene and fled in a taxi. The circumstantial evidence that the perpetrators fled to avoid arrest was substantial.

Nevertheless, the prosecutor should make clear before the retrial begins whether she will request the accomplice liability and flight charges based on the anticipated testimony of her witnesses. The trial court will then have ample time not only to consider defendant's arguments about why the charges should not be given, but also to evaluate the parties' competing positions and applicable precedent as the proofs are developed during trial.

We trust that during the third trial the prosecutor will confine her opening remarks to the evidence she intends to present during the trial; confine her remarks in summation to the evidence presented and the reasonable inferences from such evidence; and refrain from commenting on matters not developed during trial, such as matters presented before the grand jury but not presented to the petit jury. This comment should not be construed as evidencing any opinion on our part about the validity or invalidity of defendant's argument that the prosecutor engaged in misconduct. We recognize that prosecutors and defense counsel alike are not always capable of precisely recalling every statement made by witnesses during a lengthy trial. As a consequence, an attorney

14

may inadvertently misstate inconsequential evidence during a summation. Here, however, this case will be tried for a third time. By the time the attorneys give their closing arguments, they should have sufficient mastery of the evidence to avoid inadvertent misstatements.

We have considered the parties' remaining arguments and found them to be without sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION